## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JONATHAN MANN and BRIAN L. FRYE,<br><br>         Plaintiffs,<br><br>         v.<br><br>SECURITIES AND EXCHANGE COMMISSION, ERIC I. BUSTILLO, GARY GENSLER, CAROLINE A. CRENSHAW, JAIME E. LIZÁRRAGA, HESTER M. PEIRCE, and MARK T. UYEDA, in their official capacities,<br><br>         Defendants. | **CIVIL ACTION NO.**<br><br>_____<br><br>**JUDGE**<br><br>**MAGISTRATE JUDGE** |

## <u>COMPLAINT</u>

1.      This case is about art.  More specifically, should art be regulated by the Securities and Exchange Commission?  Should artists have to "register" their artwork before selling it to the general public?  Should artists be forced to make public disclosures about the "risks" of buying their art?  Should artists be required to comply with the federal securities laws, and the thousands of regulations and reams of interpretive guidance thereunder, just to offer their works to the public?  Or can artists simply create, and sell, art?

2.      The answers to these questions seem obvious.  It would have been ridiculous to require great American visual artists like Lichtenstein, Basquiat, Warhol, O'Keeffe, Rockwell, Pollock, Frankenthaler, or Wyeth to "register" their paintings, or offer them under some exemption in the securities laws, just because they sold multiple copies of their artworks, or made art in a series of related topics.  It would be crazy to think that Bob Dylan, Janis Joplin, the Rolling Stones, Ray Charles, Jimi Hendrix, Madonna, or Louisiana's own Louis Armstrong should have retained attorneys to examine the SEC's Form S-1 to see how to register their music for sale to the general

public, or scour the exemptions of Regulation D and sell only to "accredited investors," or plumb the depths of Regulation S to sell their tunes only to overseas "investors." None of that would make any sense whatsoever. And requiring such nonsensical barriers would have strangled the production of some of the greatest American artists, and the greatest American art.

3. The application of securities laws to artwork makes no more sense in the digital world. Yet, the United States Securities and Exchange Commission (the "SEC" or the "Commission") has begun to wage a campaign to assert jurisdiction over sales of digital art, which should ring alarm bells for every artist and patron in America.

4. Two recent administrative actions launched by the SEC suggest that the SEC is getting into the art business, determining when art needs to be registered with the federal government before it can be sold. In doing so, the SEC has anointed itself with the power to turn Louisiana's next Buddy Guy, Dr. John, Mahalia Jackson, Tim McGraw, or Dawn Dedeaux into federal scofflaws, and to act as a gatekeeper that must be assuaged before future artists are permitted to sell their first album or visual artwork.

5. Plaintiffs Jonathan Mann, who sells music in Louisiana and elsewhere, and Brian L. Frye, who lives in Louisiana and sells his art here in Louisiana as well, are artists. They regularly develop, release, and sell art in digital forms. They create art, and they offer and sell their art to the general public.

6. Unlike the artists of the previous century, who painted oil paintings on canvas, drew lithographs on paper, or recorded music on LP records, Mann and Frye are creators for the digital age. They create art to be sold in the form of "non-fungible tokens" ("NFTs"), digital assets that can take the form of art, music, videos, and in-game items, among many other things. At their core, NFTs are unique cryptographic tokens on a blockchain, that can be bought and sold with

2

digital assets or fiat, and can give the owner a wide array of digital and/or physical rights that are built directly into the software code.  Many NFTs simply represent ownership of a work of art—a digital representation of music or other artwork.

7.      Jonathan Mann is widely known as "Song a Day Mann."[1]  A singer, songwriter, multi-instrumentalist, and music producer, Mann has written and released one song a day—one complete song, every single day—since January 1, 2009.  He holds the Guinness World Record for "Most Consecutive Days Writing a Song."  His songs range from political commentary to celebrations of the everyday, and he makes his living selling his music digitally.



---

[1]      *See, e.g.*, Jonathan Mann (@songadaymann), X, https://x.com/songadaymann (last visited July 16, 2024).

8.      Brian L. Frye is a conceptual artist and law professor who resides in New Orleans, Louisiana.  Frye produces digital art as well, often conceptual multimedia productions related to his legal scholarship, providing commentary on various fields of law, which he sells as NFTs.  His NFT projects[2] build on and pay homage to the work of other conceptual artwork, such as Sol LeWitt's Wall Drawings (consisting of instructions for creating a drawing and a certificate conveying the right to execute an authentic version of the work)[3] or Maurizio Cattelan's Comedian (consisting of a certificate of authenticity with instructions for taping a banana to a wall).[4]



---

[2]      *See* Brian L. Frye, *SEC No-Action Letter Request 2: The #NFT*, OpenSea (Dec. 30, 2019), https://opensea.io/de-DE/assets/ethereum/0x495f947276749ce646f68ac8c248420045cb7b5e/86968975984154595632 20917650739844776945566570740915321370628745823340 8815105.

[3]      *See* Sol LeWitt, *Imitating Sol LeWitt's Wall Drawing #1136 in Javascript*, Bill Mill (Nov. 08, 2021), https://billmill.org/sol_1136.html.

[4]      *See* Maurizio Cattelan, Comedian (2019), Artnet, https://news.artnet.com/market/maurizio-cattelan-banana-art-basel-miami-beach-1722516.




9.      Plaintiffs have in the past sold digital art, and have imminent plans to sell their art, in Louisiana and elsewhere, as larger-scale and widely-promoted limited edition NFTs.

10.      But recent SEC actions have illustrated that the SEC will view their art sales as unregistered securities offerings.  Plaintiffs' fear of an investigation or enforcement action by the SEC is well-founded, after the SEC's recent investigations and administrative actions involving NFTs. *See In the Matter of Impact Theory, LLC*, Securities Act Rel. No. 11226 (Aug. 28, 2023) ("Impact Theory"); *In the Matter of Stoner Cats 2, LLC*, Securities Act Rel. No. 11233 (Sept. 13, 2023) ("Stoner Cats"); *see also* Investigation into Dapper Labs, Inc., Matter No. MSF-04501 (closed Sept. 29, 2023).

11.      The *Impact Theory* and *Stoner Cats* administrative proceedings were both settled by their respondents with a clear statement from the SEC about its view that digital artworks— when accompanied by royalties and public statements regarding the artist's current and future endeavors, their hopes for the value of those endeavors, and/or their use of profits to support themselves and their endeavors— are securities. The SEC's position raises a host of unanswered questions for creators, sellers, and buyers of NFTs—chiefly, in what circumstances does the offer and sale of NFTs constitute securities offerings or sales?

12.     In these administrative actions, the SEC charged Impact Theory and Stoner Cats with "conducting an unregistered offering of crypto asset securities in the form of purported non-fungible tokens."  They sold artwork to the general public.  The NFTs were not shares of a company and did not generate any type of dividend or ongoing commitment to generate profits for the purchasers.  They were works of digital art, and other than that digital nature, there was little conceptual difference between those series of artworks and, say, Andy Warhol's 1962 series of thirty-two canvases, called "Campbell's Soup Cans."[5]



13.     In their recent administrative actions, the SEC asserted that a series of artworks, sold to the public as digital assets, with expectations that the art would appreciate in value and could thus be re-sold, constituted an "investment contract," *i.e.*, a security.  In doing so, the SEC

---

[5]     *See* Andy Warhol, *Campbell's Soup Cans* (1962), Museum of Modern Art, https://www.moma.org/collection/works/79809.

unilaterally grabbed the regulatory reins over digital art, without authorization from Congress, and without undertaking proper (or any) rulemaking procedures. The SEC's expansive approach to regulating various sectors of the burgeoning NFT industry widens beyond all recognition the scope of the seminal Supreme Court case *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), which set forth the definition of an investment contract. However, the SEC is not authorized to unilaterally expand the reach of *Howey* or federal securities law.

14. The relationship between a creator of digital artwork and a NFT holder is not meaningfully different from the relationship between any other type of artist and art owner. By acquiring artwork in the form of NFTs, the purchaser does not automatically (or typically) enter any ongoing contractual relationship with the seller or creator of the asset. While the seller or creator—like Plaintiffs here—may publicly discuss their intentions to continue creating and marketing their art and may use the profits from the NFT sales to financially support themselves and their artistic endeavors, that does not mean that the seller or creator has any ongoing commitment or obligation to undertake any specific action or to manage any common venture for the purchaser's benefit. Instead, the purchaser possesses and holds the asset outright, albeit perhaps with a subjective *hope* or *belief* that the asset will increase in value. Thus, no investment contract exists under the test established by *Howey*.

15. The SEC's approach threatens the livelihoods of artists and creators that are simply experimenting with a novel, fast-growing technology or have chosen it as their preferred medium. Artists nationwide are suddenly confronted with the specter of the SEC attacking their distribution of visual or musical art as an unregistered securities offering. Artists—both established artists and young upstarts—are suddenly faced with a bizarre question: do they need to hire a securities lawyer just to sell their art?

16.     It is difficult to imagine a 21st Century Buddy Guy, who famously left Louisiana "looking for a dime," spending that dime—and thousands of dollars more—on securities lawyers to advise him of the securities laws risks of selling his music to the general public.  And it is even harder to imagine the absolute impoverishment of American art and music if we constructed barriers to the next generation of artists, many of whom are growing up working natively in digital realms.

17.     For these reasons (among others), two out of the five SEC Commissioners dissented from the SEC's proceedings in *Impact Theory* and *Stoner Cats*, questioning whether there was "a sufficient basis to pull the matter into [the SEC's] jurisdiction," and lamenting the SEC's lack of guidance on these issues.[6]

18.     Ultimately, the SEC under the current chair, Gary Gensler, has taken an extremely expansive view of its own authority in the context of digital assets, a view that is far more expansive than the SEC has historically taken with respect to physical assets.  And now that the SEC has included the NFT industry within its purported remit, without properly grappling with the multitude of open questions raised by applying the securities laws to art, Plaintiffs here—as well-known creators of NFTs—justifiably fear that they will be subject to the SEC's aggressive tactics and that their upcoming offer and sale of NFTs will be deemed to be unregistered securities offerings.

19.     Plaintiffs thus seek a declaratory judgment that their proposed NFT projects do not violate U.S. securities laws—*i.e.*, that they would not be engaging in the offer and sale of securities

---

[6]     *See* SEC Comm'rs Hester M. Peirce and Mark T. Uyeda, *NFTs & the SEC: Statement on Impact Theory, LLC* (Aug. 28, 2023), https://www.sec.gov/news/statement/peirce-uyeda-statement-nft-082823.

by merely publicly offering and selling their art as NFTs, attaching royalties to the NFTs, and/or marketing the NFTs and their personal artistic endeavors to the public.

## JURISDICTION AND VENUE

20.     This suit arises and is brought under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*  Accordingly, the Court has subject matter jurisdiction under 28 U.S.C. § 1331.

21.     Venue is proper in this district because Plaintiff Brian L. Frye resides in this district, and no real property is involved in this action.  *See* 28 U.S.C. § 1391(e)(1)(C) (providing that venue in actions against a federal officer or agency is proper "in any judicial district in which . . . the plaintiff resides if no real property is involved in the action").

22.     Additionally, and independently, venue is proper because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district:  Plaintiff Jonathan Mann has sold and continues to sell NFTs of his songs in this district.  Moreover, Plaintiff Frye created his project in this district, and plans to sell it in this district through Securities Art LLC, a Louisiana limited liability company.  Both Plaintiffs' anticipated future projects will be available for sale in this district.  *See* 28 U.S.C. § 1391(e)(1)(B) (providing that venue in actions against a federal officer or agency is proper "in any judicial district in which . . . a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated").

## PARTIES

23.     Jonathan Mann is a singer and songwriter who resides in Hartford, Connecticut. Known professionally as "Song a Day Mann," Mann has written and recorded one song every day since January 1, 2009.  He holds the Guinness World Record for "Most Consecutive Days Writing a Song."  Since 2018, his songs have been published as NFTs on the Ethereum blockchain ("Song

9

A Day NFTs").  Mann currently sells each song as a Song A Day NFT via a "bid-to-earn" auction. Mann has built a community of followers and continues to build "his brand."  Some people buy his Song A Day NFTs out of enjoyment of his music, but others buy his NFTs in the hope that they will increase in value, as his brand gains renown.

24.     Brian L. Frye is a conceptual artist who resides in New Orleans, Louisiana.  Frye's artistic playbook consists of creating conceptual art in the medium of legal scholarship and selling it as NFTs—each NFT collection is typically accompanied by an essay, in which Frye explains his objectives for the project.  Frye holds an MFA in filmmaking, and his film *Oona's Veil* is included in the permanent collection of the Whitney Museum of American Art in New York and was exhibited at the Whitney twice in the 2002 Whitney Biennial collection (March 7–May 26, 2002) and in America Is Hard to See (May 1–September 27, 2015).[7]  He has also presented his art at many other museums and film festivals.  Frye is also a Spears-Gilbert Professor of Law at the University of Kentucky J. David Rosenberg College of Law, where he teaches courses in civil procedure, professional responsibility, intellectual property, copyright, and nonprofit organizations.  (Frye brings this case in his individual capacity.)

25.     Defendant SEC is an agency of the federal government headquartered at 100 F Street, NE, Washington, DC 20549.  The SEC is charged with enforcing the federal securities laws, including the Securities Act of 1933, 15 U.S.C. § 77a *et seq*. (the "Securities Act"), and the Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. (the "Exchange Act").

---

[7]     *See* Brian L. Frye, *Oona's Veil* (2000), Whitney Museum of American Art, https://whitney.org/collection/works/16047.

26.     Defendant Eric I. Bustillo is the Regional Director of the Miami Regional Office of the SEC, which has jurisdiction in Florida, Mississippi, Louisiana, U.S. Virgin Islands, and Puerto Rico.  He is sued in his official capacity.

27.     Defendant Gary Gensler is Chair of the SEC.  He is sued in his official capacity.

28.     Defendant Caroline A. Crenshaw is a Commissioner of the SEC.  She is sued in her official capacity.

29.     Defendant Jaime E. Lizárraga is a Commissioner of the SEC.  He is sued in his official capacity.

30.     Defendant Hester M. Peirce is a Commissioner of the SEC.  She is sued in her official capacity (although Commissioner Peirce dissented from the SEC's settlements in *Impact Theory* and *Stoner Cats*).

31.     Defendant Mark T. Uyeda is a Commissioner of the SEC.  He is sued in his official capacity (although Commissioner Uyeda dissented from the SEC's settlements in *Impact Theory* and *Stoner Cats*).

## NATURE OF THE ACTION

### A.     The Securities Act and Exchange Act

32.     The Securities Act and the Exchange Act give the SEC authority to regulate transactions involving "securities."  The term "security" means:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on

11

a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. §77b(a)(1); *see* 15 U.S.C. §78c(a)(10) (similar).

33.    That list, while extensive, does not include commodities such as gold, wheat, sugar, or oil.  Additionally, section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), does not include collectibles (such as stamps, baseball cards, guitars, or watches) within its defined set of "securities."

34.    To state what should be obvious, the Securities Act and the Exchange Act do not include "art" within their remit.

35.    The Securities Act requires offerors and sellers of securities to register with and make disclosures to the SEC, *see* 15 U.S.C. § 77e(a), (c), a process which can be prohibitively costly.  In the cases of commodities that are not securities, such registration is literally impossible. In the case of art or music, such registration is nonsensical.

**B.**    ***SEC v. W.J. Howey Co.***

36.    Both the Securities Act and the Exchange Act include the term "investment contract" in their definition of a "security."

37.    In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 295-96 (1946), the Supreme Court considered a case involving a Florida corporation which sold buyers orange groves, along with a contract to cultivate, harvest, and market the oranges.  In return, the purchasers were entitled to a percentage of the net profits from the sale of the orange crop from the entire grove.  *Id.* at 296. The Supreme Court concluded that this arrangement constituted an "investment contract," and therefore, a security.

12

38.     Under *Howey*, "an investment contract for purposes of the Securities Act, means a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party."  *Id.* at 298-99.

39.     Notably however, the Supreme Court also explained that "investment contract" did not encompass all transactions involving something a person purchases with the hopes it will increase in value.  *Id.* at 298.

40.     Rather, in *Howey*, the seller was "offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by" the seller.  *Id.* at 299.  That kind of arrangement, in which "[t]he investors provide the capital and share in the earnings and profits," and "the promoters manage, control, and operate the enterprise" for the investors' benefit, is an investment contract.  *Id.* at 300.

41.     Because the promoters in securities transactions are managing, controlling, and operating the enterprise for the investors' benefit, the securities laws impose extensive registration and disclosure requirements on the issuers of securities.  15 U.S.C. § 77e(a), (c); *Van Huss v. Associated Milk Producers, Inc.*, 415 F. Supp. 356, 360 (N.D. Tex. 1976) ("Congress intended the securities laws to have a long reach in order to effect the remedial purposes of the statute and to allow the flexibility necessary to cope with the endless ingenuity of unscrupulous, fast-talking promoters.  At the same time, Congress never intended the securities laws to apply to all sales; otherwise, the detailed reporting provisions and other requirements would seriously clog everyday commerce").

C.     **The Digital Asset Industry**

42.     In the short existence of the digital asset industry, it has grown to be valued—very conservatively—at over a trillion dollars.[8]   As of this writing, the total value of all fungible, tradeable cryptocurrencies exceeds $2.4 trillion.[9]  About 52 million Americans, 1 in 5 adults, now own cryptocurrency.[10]

43.     This figure is a conservative indicator, and does not include the digital art space, which adds to that $2.4 trillion figure immeasurably, both in calculable ways (via the combined value of all the digital art that exists), and in incalculable ways, in the artistic and cultural value of new and burgeoning art forms.  The percentage of Americans who own digital assets—in the form of art, music files, video games, or photographs on their phone—approaches 100%.

44.     A blockchain is commonly described as a distributed ledger, which is a database maintained on the Internet that can record and verify data across the entire network.  Transactions on a public blockchain can be viewed and verified by anyone with an Internet connection.

---

[8]     *See* Navdeep Singh, *Crypto Price Today: Bitcoin below $22,800; crypto market cap crosses $1 trillion,* The Economic Times (Jan. 23, 2023), https://economictimes.indiatimes.com/markets/cryptocurrency/crypto-prices-today-live-news-bitcoin-dogecoin-ethereum-shibha-inu-cryptocurrency-latest-updates-23-january-2023/articleshow/97244031.cms?from=mdr.

[9]     *See* Today's Cryptocurrency Prices by Market Cap, https://coinmarketcap.com/ (last visited July 27, 2024).

[10]     *See A Call To Action: Mobilizing 52 Million Crypto Owners Into An Army of One Million Advocates For Change*, Coinbase (Sept. 19, 2023), https://www.coinbase.com/blog/a-call-to-action-mobilizing-52-million-crypto-owners-into-an-army-of-1; *see also* DCG, *Crypto Attitudes in Swing States*, Blockchain Association (May 7, 2024) (reporting that about 1 in 5 registered voters in the swing states of Michigan, Nevada, Ohio, Montana, Pennsylvania, and Arizona consider cryptocurrency a major issue in the 2024 election and that about 1 in 3 believe cryptocurrency levels the playing field for building financial health), https://theblockchainassociation.org/wp-content/uploads/2024/05/DCG_HarrisPoll-Research-Report.pdf.

45.     Blockchain technology has been developed for a wide range of uses, including both financial uses and non-financial uses such as identity verification, community governance, supply chain management, and records and data storage.  At a foundational level, blockchain technology enables the enforcement of property rights in the digital world.

46.     Digital assets, including those known as "cryptocurrencies," "crypto assets," and "tokens," are computer code entries on a blockchain that provide the owner with certain specified rights, potentially to access an application or service on a computer network or to engage in decentralized governance of a blockchain network.  As with real world assets, digital assets can be fungible (each storing divisible and non-unique value) or non-fungible (each representing a unique and indivisible item, such as artwork).

47.     By acquiring a digital asset, the owner does not necessarily enter any ongoing contractual relationship with the seller or creator of the asset.  In fact, the vast majority of digital asset transactions involve no ongoing commitments or obligations with respect to the underlying asset.  Rather, the owner purchases, possesses, and holds the asset outright—even though he or she may hope or believe that the asset will increase in value based on market forces, similar to any other sort of asset, commodity, or memorabilia with potential resale value, including art.

D.      **SEC Enforcement in the Digital Asset Industry**

48.     In 2017, the SEC issued a report on an investigation into an unincorporated organization called The DAO, which, according to the SEC, had sold DAO tokens in exchange for a stake in its plans to fund various projects using the money generated by those sales.  *See* SEC Rel. No. 81207, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017), https://www.sec.gov/files/litigation/investreport/34-81207.pdf (the "DAO Report").  In the SEC's view, that initial offering qualified as an offer of "investment

contracts," rendering The DAO an unregistered "issuer" of securities.  *Id.* at 16.  The SEC further posited that secondary transactions The DAO facilitated in its tokens were investment contracts as well, rendering The DAO an unregistered securities exchange too.  *Id.* at 17.

49.    However, in the DAO Report, the SEC specifically said that whether the securities laws apply to a digital asset depends on the "particular facts and circumstances."  *Id.* at 10.

50.    The following year, the Director of the SEC Division of Corporation Finance, Bill Hinman, stated that "strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in *Howey* were not."  SEC Director of Div. of Corp. Fin. William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, Remarks at the Yahoo Finance All Markets Summit: Crypto (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.  Hinman further opined that neither of the two most prominent digital assets, Bitcoin and Ether, is a security, and that secondary market sales of those digital assets are not investment contracts.  *Id.*

51.    The Commission's view that digital assets alone are not securities has been endorsed by other Commissioners.[11]

52.    Defendant Gary Gensler himself likewise echoed Mr. Hinman's statements prior to becoming Chair when as a professor he told his students that "three quarters of the [digital asset] market is non-securities.  It's just a commodity, a cash crypto."[12]

---

[11]    *See* SEC Chair Jay Clayton, *Remarks on Capital Formation at the Nashville 36/86 Entrepreneurship Festival* (Aug. 29, 2018), https://www.sec.gov/news/speech/speech-clayton-082918; SEC Comm'r Hester Peirce, *Regulation: A View from Inside the Machine* (Feb. 8, 2019), https://www.sec.gov/news/speech/peirce-regulation-view-inside-machine.

[12]    MIT OpenCourseWare, *Secondary Markets & Crypto-Exchanges* (Fall 2018), https://ocw.mit.edu/courses/15-s12-blockchain-and-money-fall-2018/11cb22fb5511632ea5a51a9d3ea3b41f_KHBi3n0hUSU.pdf.

53.   In May 2021, Gensler testified before Congress in his role as SEC Chair that "only Congress" could address the regulation of digital assets "because right now the exchanges trading in these crypto assets do not have a regulatory framework . . . at the SEC."[13]

54.   At least one SEC Commissioner has continued to express a similarly constrained view of the SEC's power, explaining that if the agency "seriously grappled with the legal analysis and our statutory authority, as we would have to do in a rulemaking, we would have to admit that we likely need more, or at least more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us."[14]

55.   In 2019, an SEC division published a 60-factor "Framework" for analyzing whether a digital asset may or may not be a security.[15]

56.   Since that time, the SEC has provided no constructive guidance, but has pivoted to aggressively regulating the digital assets industry through enforcement actions in a nationwide campaign, and seemingly choosing to forego an orderly rulemaking process.  To that end, the SEC

---

[13]   *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide: Virtual Hearing Before the H. Comm. on Fin. Servs., Part III*, 117th Cong. 12 (2021) (statement of SEC Chair Gary Gensler).

[14]   SEC Comm'r Hester M. Peirce, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023), https://www.sec.gov/news/speech/peirce-remarks-duke-conference-012023;  *see also Risley v. Univ. Navigation Inc.*, No. 22 Civ. 2780 (KPF), 2023 WL 5609200, at *203 (S.D.N.Y. Aug. 29, 2023) ("Congress and the courts have yet to make a definitive determination as to whether [digital assets] constitute securities, commodities, or something else.").

[15]   SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.     Notably, neither the DAO Report nor the Framework mentions NFTs.

has doubled the size of its Crypto Assets and Cyber Unit and increased its investigations of participants in the digital asset market.[16]

57.     For example, the SEC has brought numerous actions against the issuers of digital assets.  *See, e.g., In the Matter of BlockFi Lending LLC*, Securities Act Rel. No. 11029 (February 14, 2022); *SEC v. LBRY, Inc.*, No. 1:21-cv-00260 (D.N.H. March 29, 2021); *SEC v. Telegram Group, Inc. and Ton Issuer, Inc.*, No. 19-cv-9439 (S.D.N.Y. Oct. 11, 2019), *In the Matter of CarrierEQ, Inc., d/b/a AirFox*, Securities Act Rel. No. 10575 (Nov. 16, 2018); *In the Matter of Paragon Coin, Inc.*, Securities Act Rel. No. 10574 (Nov. 16, 2018).

58.     The SEC has brought actions against individuals promoting digital assets without adequate disclosure that they were being paid to do so.  *See In the Matter of Floyd Mayweather Jr.*, Securities Act Rel. No. 10578 (Nov. 29, 2018).

59.     The SEC has brought actions claiming that free distributions of digital assets (sometimes known as "airdrops") are offerings or distributions of securities, even though there is no "investment of money" or any tangible consideration provided by a recipient to receive that digital asset.  *See In the Matter of Tomahawk Exploration LLC and David Thompson Laurance*, Securities Act Rel. No. 10530 (Aug. 14, 2018); *SEC v. The Hydrogen Technology Corp.*, 1:22-cv-08284 (S.D.N.Y. Sept. 29, 2022).

60.     The SEC has brought actions against online platforms that list digital assets, without explaining *which* digital assets the platform touted were allegedly securities.  *See, e.g., In the Matter of Blotics Ltd. f/d/b/a Coinschedule Ltd.*, Securities Act Rel. No. 10956 (Jul. 14, 2021); *In the Matter of Shapeshift AG*, Securities Act Rel. 99676 (Mar. 5, 2024).

---

[16]     See SEC Press Release, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit* (May 3, 2022), https://www.sec.gov/news/press-release/2022-78.

61.     The SEC has brought actions against digital asset exchanges that facilitate secondary trading of digital assets on their platforms.  *See, e.g.*, *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738 (S.D.N.Y. June 6, 2023); *SEC v. Payward, Inc.*, No. 3:23-cv-06003 (N.D. Cal. Nov. 20, 2023).

62.     In late 2022, Gary Gensler opined, without significant explanation and directly contradicting his former statements, that the "vast majority" of tokens are securities.[17]

63.     The Commission's own members have since called its aggressive enforcement campaign against the digital assets industry a "scorched earth" strategy,[18] and stated that "the 'most important' factor of the *Howey* test" is now "an SEC-invented 'fifth shadow factor': whether the SEC wants to regulate the asset."[19]

64.     The SEC has acknowledged that a digital asset alone is not a security, since the assets themselves are simply "computer code," but takes the position that transactions in digital assets can be securities *if* the efforts of third parties "drive the value of the ecosystem" with which

---

[17]     *See* SEC Chair Gary Gensler, *Statement on Financial Stability Oversight Council's Report on Digital Asset Financial Stability Risks and Regulation Before the Financial Stability Oversight Council Open Meeting* (Oct. 3, 2022), https://www.sec.gov/news/speech/gensler-statement-fsoc-meeting-100322 ("Of the nearly 10,000 tokens in the crypto market, I believe the vast majority are securities.");  *see also* SEC Chair Gary Gensler, *Prepared Remarks of Gary Gensler On Crypto Markets - Penn Law Capital Markets Association Annual Conference* (Apr. 4, 2022), https://www.sec.gov/news/speech/gensler-remarks-crypto-markets-040422 ("[M]any of the tokens trading on these platforms may well meet the definition of 'securities.'");  SEC Chair Gary Gensler, *Remarks Before the Aspen Security Forum* (Aug. 3, 2021), https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 ("I believe we have a crypto market now where many tokens may be unregistered securities….").

[18]     SEC Comm'r Hester M. Peirce, *Overdue: Statement of Dissent on LBRY* (Oct. 27, 2023), https://www.sec.gov/news/statement/peirce-statement-lbry-102723.

[19]     SEC Comm'r Hester M. Peirce, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023), https://www.sec.gov/news/speech/peirce-remarks-duke-conference-012023 (quoting Bankless Shows, *Are NFTs Securities? with Securities Lawyer Brian Frye* (Jan. 3, 2023), https://www.youtube.com/watch?v=jo1ZuhuCVZE at 16:56).

the asset is associated.[20]  Despite never defining what constitutes an "ecosystem," the SEC has implied that any efforts made to further develop an asset's "ecosystem" (however that is defined) satisfies the "common enterprise" and "efforts of others" prongs of the *Howey* test.

65.     This view is particularly alarming to digital artists, like Plaintiffs here, who arguably build something akin to an "ecosystem" for their art:  a presence on social media, collections of artworks for sale, live performances, and a promise to continue creating art as part of their larger visions.  Indeed, building an "ecosystem" and an audience for their art is typically integral to artists' livelihood—without marketing and sales, they would be unable to continue creating art.  For an artist, creating an "ecosystem" to support his or her art sales is almost as important as creating the art itself.

66.     By referencing efforts to "drive the value of the ecosystem" with which a digital asset is associated without further explanation, the SEC is circumventing the clearly delineated factors of the *Howey* test altogether in favor of what Commissioner Peirce described as an unprincipled fifth shadow factor of its own creation.

67.     Indeed, one Commissioner openly describes the SEC's inconsistent approach as a "secret garden," noting that "guidance is not promulgated through notice-and-comment rulemaking, but appears in staff statements and speeches, phone calls, some types of no-action letters, and the like," and "[n]obody can challenge these diktats because they are not final agency

---

[20]     *SEC v. Payward, Inc.*, No. 3:23-cv-06003 (N.D. Cal. Feb. 22, 2024), ECF 26-1 at 18:22-23, 19:13-19, 23:13-14 (Hearing Tr. from *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738 (S.D.N.Y. Jan. 17, 2024)).

action, but compliance is mandatory for an entity wishing to avoid SEC delays, denials, and enforcement and examination scrutiny."[21]

68.     Now, the SEC has made its foray into the NFT space via two enforcement actions, claiming jurisdiction over an entire industry without proper authorization from Congress. *See Impact Theory*, Securities Act Rel. No. 11226; *Stoner Cats*, Securities Act Rel. No. 11233. As explained below, in these actions against creators of NFTs, the SEC stated its view that the NFTs themselves represent an investment contract. The SEC thus introduced an entire enforcement apparatus—investigations of, and actions against, token issuers, promoters, people who give digital assets away for free, trading platforms, and token exchanges—into the world of digital art.

## E.     The NFT Space

69.     The first known NFT was created in 2014.  NFTs are non-fungible digital assets recorded on a blockchain.  Within the digital art world, NFTs are used to convey ownership of digital artwork, including uniquely generated digital images, music or collectible.  Each NFT is minted with a unique identifier or serial number.

70.     Generally, NFTs allow people to authenticate the ownership of the linked image, music, or collectible in an automated, permissionless, and public way.[22]

71.     NFTs differ from other digital assets such as Bitcoin, Ether, or other tokens that are fungible, *i.e.*, identical and interchangeable.  Unlike fungible cryptocurrencies, NFTs are uniquely

---

[21]     SEC Comm'r Hester M. Peirce, *At the SEC: Nothing but Crickets Remarks at SEC Speaks* (Apr. 2, 2024), https://www.sec.gov/news/speech/peirce-remarks-sec-speaks-040224.

[22]     *See* IRS, *Treatment of certain nonfungible tokens as collectibles*, https://www.irs.gov/pub/irs-drop/n-23-27.pdf,   at 1 (last visited June 25, 2024); *see also* Congressional Research Service, *Non-Fungible Tokens (NFTs)* (Jul. 20, 2022), https://crsreports.congress.gov/product/pdf/R/R47189.

identifiable and irreplaceable.  This means that even though two NFTs may look identical, they are not interchangeable and cannot be copied or replicated.

72.     NFTs often constitute digital images, music, or collectibles, but can also be expanded into a variety of other digital property rights, such as ticketing or real estate, for example.

73.     NFTs are typically offered and sold in primary offerings by the artist that creates the underlying artwork to which the NFT relates.

74.     NFTs often provide the owner a wide array of rights to digital and/or physical assets, including all rights that typically accompany ownership.  As a result, NFTs can typically be bought, sold, and traded on secondary markets, with ownership rights to the NFT being transferable by the owner to the buyer.

75.     NFTs are, at heart, software; and as such, they are composable and malleable. NFTs can incorporate into their code rights management, automatic royalty payments assessed on secondary transfers, transformation from one form of art into another, or many other features. These features "travel" with the NFT if it is transferred or sold to a new user.  They are limited only by the human imagination.

76.     NFTs are often compared to physical art and collectibles, such as baseball cards, Pokémon cards, sneakers, or watches.






77.     Thus, as has been explicitly recognized by one Commissioner, the SEC's broad interpretation of the *Howey* test threatens to not only sweep into its jurisdiction all digital art represented by NFTs regardless of the context in which they are offered and sold; it would also sweep into its scope *all* art and collectibles.[23]

78.     Read broadly enough, *all* art and collectibles involve a person investing money in a common enterprise, with an expectation of profit if the artist becomes more famous or the value of the art increases on the resale market.

---

[23]     *See* SEC Comm'r Mark T. Uyeda, *Remarks to the Council of Institutional Investors – Dangers of the Unbounded Administrative State* (Mar. 5, 2024), https://www.sec.gov/news/speech/uyeda-remarks-cii-030524; *see infra* ¶ 142.

79.     For example, Andy Warhol first displayed his iconic soup can paintings when he was a relatively unknown artist in 1962.[24]  He ultimately sold the paintings as a complete set of 32 for $1,000 in 1962.[25]  But, Warhol's star continued to rise, and by 1964, the asking price for a single soup can painting had shot up to $1,500.[26]  In 1996, the Museum of Modern Art bought the 32 paintings at an eye-popping valuation of over $15 million.[27]

80.     Following their initial release in 1962, investors in Warhol's art could have purchased the art with an expectation of an increase in value, even relying on Warhol's own statements about his art, its "ecosystem," and his commentaries about art: "I don't think art should be only for the select few.  I think it should be for the mass of the American people."[28]  "Being good in business is the most fascinating kind of art.  Making money is art and working is art and good business is the best art."[29]

81.     Yet, those purchases would undoubtedly not be securities under the *Howey* test for an investment contract.  As the Supreme Court clearly foresaw and explained, an "investment contract" does not encompass all transactions involving something one purchases with the hopes it will increase in value.  *Howey*, 328 U.S. at 298.

---

[24]    *See* Susan Delson, *Andy Warhol's Soup Can Paintings: What They Mean and Why They Became a Sensation*, History.com (Sept. 14, 2023), https://www.history.com/news/andy-warhol-1962-soup-can-paintings-meaning-reaction.

[25]    *Id.*

[26]    *Id.*

[27]    *Id.*

[28]    *See* Andy Warhol, Campbell's Soup Cans (1962), Museum of Modern Art, https://www.moma.org/collection/works/79809.

[29]    Andy Warhol, *The Philosophy of Andy Warhol (From A to B and Back Again)* 92 (1975).

82.     The SEC misunderstands this point, as demonstrated by its incursion into the digital art markets.  In May 2022, the SEC listed NFTs as an area of interest when it expanded its Crypto Assets and Cyber Unit.[30]

83.     The Commission has never engaged in rulemaking to adopt or explain the SEC's view that it has jurisdiction over NFTs.  Neither has it engaged in rulemaking to address which NFT transactions involve the offer and sale of a security.

**F.      The SEC's Claimed Authority Over the NFT Space**

        i.     *In the Matter of Impact Theory, LLC*

84.     Before August 2023, the SEC had not issued any formal guidance regarding or taken any public action against creators of digital art and sales of such art via NFTs.[31]

85.     However, on August 28, 2023, the SEC announced charges against and a settlement with Impact Theory, LLC, a media and entertainment company, for allegedly offering and selling unregistered securities in the form of NFTs—the SEC referred to them as "purported NFTs"— called Founder's Keys ("KeyNFTs").[32]

86.     KeyNFTs were offered and sold in three "tiers," and each KeyNFT contained a digital graphic with a combination of four out of 50 possible symbols.

---

[30]     *See* SEC Press Release, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit* (May 3, 2022), https://www.sec.gov/news/press-release/2022-78.

[31]     The SEC investigated Dapper Labs Inc., whose products include NBA Top Shot and CryptoKitties NFTs, but reportedly issued a "Case Closing Report" on September 29, 2023.  The report did not indicate why the SEC was investigating Dapper Labs, when the investigation was commenced, or why the investigation was closed.  *See* Ben Weiss, *The SEC investigated NBA Top Shot developer Dapper Labs, but decided to close case in September*, Fortune (Apr. 11, 2024), https://fortune.com/crypto/2024/04/11/sec-dapper-labs-investigation-case-closed-september-2023-roham-gharegozlou/amp.

[32]     *Impact Theory*, Securities Act Rel. No. 11226.

87. The SEC alleged that Impact Theory's public statements invited potential investors to view the purchase of a KeyNFT as an investment in a business. Particularly, the SEC cited Impact Theory's statements that the future value of KeyNFTs would be much higher than the purchase price, and that Impact Theory was "trying to build the next Disney" and would deliver "tremendous value" to KeyNFT purchasers if successful. The SEC further claimed that Impact Theory said it would use proceeds from the offering for "development," "bringing on more team," and "creating more projects," and that, consistent with such statements, Impact Theory collected the proceeds from the KeyNFT sales in a single crypto asset wallet and used a portion of the proceeds to pay vendors providing services related to Impact Theory's business.

88. The SEC also indicated that Impact Theory made public statements regarding two secondary market platforms where KeyNFTs could be traded and programmed the smart contract for the KeyNFTs so that the company would receive a 10% royalty on each secondary market sale.

89. Based on these facts, the SEC ultimately determined that KeyNFTs were offered and sold as investment contracts, and therefore securities, under *Howey*, though the purchasers had no rights to profits or ongoing efforts from the creators.

90. The repercussions were no mere slap on the wrist. As part of the settlement, Impact Theory agreed to pay disgorgement of $5,120,718.27, prejudgment interest of $483,195.90, and a civil money penalty of $500,000 to the SEC.

91. Astonishingly, the settlement also includes an undertaking that Impact Theory would destroy all of the purportedly offending NFTs in its possession or control within 10 days.

92. The SEC literally demanded that artists destroy their art, as punishment for violating its unprecedented diktat that art was a security.

26

93.     SEC Commissioners Peirce and Uyeda issued a dissent to the Impact Theory action.

First, the dissenting Commissioners took issue with the SEC's application of the *Howey* test,

stating that "the NFTs were not shares of a company and did not generate any type of dividend for

the purchasers" and "[t]he handful of company and purchaser statements cited by the order are not

the kinds of promises that form an investment contract. We do not routinely bring enforcement

actions against people that sell watches, paintings, or collectibles along with vague promises to

build the brand and thus increase the resale value of those tangible items."[33]

94.     Moreover, the dissenting Commissioners questioned whether an enforcement

action was warranted even if KeyNFTs were offered and sold as securities, and stressed that "this

matter raises larger questions with which the Commission should grapple before bringing

additional NFT cases."[34]

      *ii.*     *In the Matter of Stoner Acts 2, LLC*

95.     Instead of grappling with such questions, the SEC brought another enforcement

action against a NFT issuer two weeks later.

96.     On September 13, 2023, the SEC announced charges against and a settlement with

Stoner Cats 2, LLC ("SC2"), for allegedly offering and selling securities in the form of "Stoner

Cats" NFTs in order to finance the production of an animated web series called Stoner Cats.[35]

97.     Each Stoner Cats NFT consisted of a uniquely generated image of one of the Stoner

Cats characters. They provided holders with exclusive access to view the Stoner Cats web series

---

[33]     SEC Comm'rs Hester M. Peirce and Mark T. Uyeda, *NFTs & the SEC: Statement on Impact Theory, LLC* (Aug. 28, 2023), https://www.sec.gov/news/statement/peirce-uyeda-statement-nft-082823.

[34]     *Id.*

[35]     *Stoner Cats*, Securities Act Rel. No. 11233.

and an online Discord community, as well as access to future content that would be developed in coming years. While purchasers (like the purchasers of Impact Theory's KeyNFTs) had no rights to the profits from the content or ongoing efforts from the creators, the SEC still found that SC2 "offered and sold the Stoner Cats NFTs as an investment into SC2's efforts to create this content."

98.     Like it did in the *Impact Theory* action, the SEC cited SC2's media campaign and public statements made to promote the NFTs before and after the offering. According to the SEC, SC2's statements, which highlighted the benefits of owning Stoner Cats NFTs and the team's ability to successfully complete the project, "tied the success of the show to the value of the NFTs and thus led investors reasonably to expect to profit from the managerial and entrepreneurial efforts of SC2."

99.     The SEC also emphasized that SC2 configured Stoner Cats NFTs so that it received a 2.5% royalty for each trade on a secondary market, which the SEC said encouraged secondary sales and helped to assure purchasers that SC2 remained committed to the show after the offering. The SEC claimed that SC2 made public statements explicitly encouraging and praising secondary market sales.

100.    The SEC ultimately found that the Stoner Cats NFTs were offered and sold as investment contracts, and therefore securities, pursuant to *Howey* and its progeny, including the cases referenced in the DAO Report. The parties agreed that SC2 would pay the SEC a civil monetary penalty of $1 million.

101.    As with the settlement in *Impact Theory*, the SEC demanded (and respondents agreed) as part of the settlement that SC2 "destroy all Stoner Cats NFTs in Respondent's possession, custody or control within 10 days of this Order."

28

102.    It is worth repeating this undertaking:  the SEC demanded, of both Impact Theory

and SC2, that the companies *destroy digital art they had created but not yet sold*.  That's right: the

United States federal government demanded that an artist destroy their art, because an agency of

the federal government decided that it was being offered or sold contrary to federal law.

103.    It is important to note that both *Impact Theory* and *Stoner Cats* settled with no

admissions of liability from the respondents in each case.

104.    As in *Impact Theory*, Commissioners Peirce and Uyeda again filed a dissent in

*Stoner Cats*, lamenting that "[t]he application of the *Howey* investment contract analysis in this

matter lacks any meaningful limiting principle" and "carries implications for creators of all

kinds."[36]   Focusing on the dangerous implications for artists and innovators, the dissenting

Commissioners stated:

> Were we to apply the securities laws to physical collectibles in the same way we
> apply them to NFTs, artists' creativity would wither in the shadow of legal
> ambiguity. . . .
>
> Whether an artist is selling numbered versions of physical prints for fans to display
> on their walls or NFTs for fans to display on social media, she deserves clear
> guidance about whether and how the securities laws apply.  Artists of all kinds have
> long struggled to support themselves, and NFTs offer a potentially viable way for
> them to monetize their talents.  The fact that money is involved does not transform
> NFTs into securities.
>
>                                        . . .
>
> NFT creators, along with other artists, do not get a free pass from the securities
> laws.  In some instances, sales of NFTs may implicate our securities laws.  In
> applying the securities laws in this space, however, the Commission must take care
> to preserve the ability of artists to sell their work, build a fan base, and involve that
> fan base in future creative endeavors. . . .  The Commission's application of the
> securities laws here makes little sense and discourages content creators from
> exploring ways to harness social networks to create and distribute content.  More

---

[36]     SEC Comm'rs Hester M. Peirce and Mark T. Uyeda, *Collecting Enforcement Actions:
Statement on Stoner Cats 2, LLC* (Sept. 13, 2023), https://www.sec.gov/news/statement/peirce-
uyeda-statement-stonercats-091323.

generally, it contributes to the legal ambiguity facing artists, writers, musicians, filmmakers, and others seeking to build a loyal, engaged following.[37]

    *iii.*    *The Implications of the SEC's Approach*

105.    The orders in *Impact Theory* and *Stoner Cats* clearly establish the SEC's stance that creators of NFTs engage in the offer and sale of investment contract securities when they set out to sell their art—*at least* when accompanied by royalties and marketing statements discussing their current and future artistic endeavors, their subjective hopes for the value of their projects, and/or their use of profits from the NFT sales to financially support themselves and their artistic endeavors.

106.    However, the SEC has not clarified the specific circumstances that make an "offer and sale" of an NFT a securities offering. The SEC has not clarified what artist's statements about his or her art would qualify to count as the sort of statement that would "lead investors reasonably to expect to profit from the managerial and entrepreneurial efforts" of the artists. And the SEC has not clarified what fact patterns constitute an "ecosystem" such that the prongs of the *Howey* test are supposedly met.

107.    Instead, the SEC has continued to obfuscate the issue. For example, during questioning before the House Financial Services Committee on September 27, 2023, Defendant Gensler admitted that a physical Pokémon card is not a security but expressed that a NFT representing a physical card could be a security.[38]

---

[37]    *Id.*

[38]    *See* Kate Irwin, *Is a Tokenized Pokémon Card a Security? SEC Chair Gary Gensler Responds—Kinda*, Decrypt (Sept. 27, 2023), https://decrypt.co/199009/tokenized-pokemon-card-security-sec-chair-gary-gensler-responds-kinda

108.    Ultimately, the SEC's settlements in *Impact Theory* and *Stoner Cats* create a precarious situation for artists and innovators—who regularly use the money from sales of their art to monetize new projects, and often publicize their work or take other roles to raise the commercial value of their art, even on the secondary market.

109.    However, there is no "common enterprise" just because artists can and intend to make more art, increase the value of their art, and/or sell that art to a community of loyal fans.

110.    And, it cannot be that purchasers have a "reasonable expectation of profits based on the managerial efforts of others" where they are not entitled to any ongoing efforts from the artists, even if they are aware that their favorite artists may continue to produce and sell more art.

111.    Indeed, when it comes to a true *Howey*-type investment, the investor's expectations are simple and straightforward:  the issuer will do things to try to make more money for the investor.  But when it comes to an art investment, there are no guarantees, no conditions at all, about what the artist may do.  Fundamentally, investors in art can have no reasonable expectations of the artists, and certainly cannot have comparable expectations as securities investors – even if there is a reasonable belief that the artist will continue to promote her art (both specific artworks, as well as an entire body of art).

112.    Taylor Swift sells concert tickets, in addition to a wide array of other collectibles that are bought and sold on secondary markets—albums, clothing, books, even guitars.[39]

---

[39]    *See, e.g.*, Taylor Swift Signed Guitar, Lot #49213, Heritage Auctions, https://entertainment.ha.com/itm/music-memorabilia/autographs-and-signed-items/taylor-swift-signed-guitar/a/7011-49213.s.



113.    Some people undoubtedly buy her tickets and merchandise purely for enjoyment. But others buy her tickets and merchandise in the hopes that they can resell those products for a profit.  As Taylor Swift grows more famous, makes more music, and gives more concerts, all of these products may command a higher resale value in a secondary market.  And Taylor Swift indeed makes promotional statements, gives concerts, releases new music, sells merchandise, and otherwise promotes aspects of her ecosystem.  Purchasers of her tickets and merchandise may well be investing their money in the Taylor Swift "ecosystem" with the expectation that Ms. Swift will continue her promotions and artistic creations, thus driving the value of those products higher.  *Cf. Howey*, 328 U.S. 293, 298-99.

114.    It would be utterly nonsensical for the SEC to treat Taylor Swift tickets or collectibles as securities.  The *Howey* test is meant to be flexible, but it cannot be limitless.  If the SEC's interpretation of *Howey* makes Taylor Swift a securities laws violator for simply making music, performing it, and selling merchandise, then the *Howey* test makes no sense in the context of art.

115.    Imagine if the SEC found that Taylor Swift songs or collectibles were securities (or were securities if merely released in NFT form), and ordered them to be destroyed.  It sounds far-

fetched.  But that is exactly what has happened to Impact Theory and SC2.  Moreover, Defendant Gensler indicated that a Pokémon card could be a security when sold as an NFT.  *See supra* ¶ 107.

116.    While Jonathan Mann and Brian Frye differ from Taylor Swift in many ways, in the context of this lawsuit, they are in exactly the same position.  They are artists, and they want to create and sell their digital art, without the SEC investigating them or filing a lawsuit.

117.    Even just an SEC investigation, let alone an enforcement litigation, can be crushing for artists who are not quite in Ms. Swift's echelon of monetary success.  Responding to a simple request for information can cost tens if not hundreds of thousands of dollars, which poses an existential threat for most artists.  Thus, an SEC investigation or litigation, or even the mere threat of one, can make the vast majority of art projects uneconomical to pursue.  Moreover, any SEC investigation carries with it an implicit threat by the SEC to bring a lawsuit.  Artists faced with an SEC investigation are therefore under immense pressure to settle and avoid the potential years and hundreds of thousands, or even millions, of dollars that that litigation would cost.

118.    The SEC is fully aware of this dynamic, and strategically offers low settlements that companies or people are likely to take as a tactic to send a message about its enforcement agenda.  And now, the SEC has sent a message, in *Impact Theory* and *Stoner Cats*, that it regulates the digital art markets, and perhaps, even the art market as a whole.

119.    The SEC's actions present the question:  Where are the bounds of the SEC's view of its own authority?  No one can confidently say that they know.  By perpetuating this ambiguity, the SEC has empowered itself to play politics with its own regulatory authority, seemingly enforcing against projects it does not like, as opposed to the ones that pose potential harms to investors.

120.     And by sowing doubt about how art can be created, offered, and sold, the SEC casts a pall over the digital art industry, artistic creation in America, and ultimately the overall American economy.

121.     Plaintiffs, like scores of other artists and creators, seek clarity about the SEC's seizure of jurisdiction over digital and traditional art markets—at least, as it applies to their own art projects, which may serve as synecdoche for the art world, as news of the SEC's overreach spreads past the traditional securities industry.  At this point, only a court can set the record straight. Accordingly, Plaintiffs ask the Court to declare that they are not engaging in the offer and sale of securities by merely offering and selling their art as NFTs, attaching royalties to their NFTs, and/or marketing their NFTs to the public.

### G.     Plaintiffs' Prospective NFT Projects

#### i.     The Mann Project

122.     Plaintiff Mann plans to release a limited edition of 10,420 NFTs, each priced around $800 (with discounted prices offered to owners of Mann's prior songs) and minted on the Ethereum blockchain composed of remixes of his popular song entitled "This Song Is A Security" (the "Mann Project").  The original "This Song Is A Security" by Jonathan Mann, Song A Day #5369 (Sept. 13, 2023), can be found here:  https://www.youtube.com/watch?v=h_4PCCt8kuo.

123.     Each mint would consist of a unique remix—variations on a theme, in some ways an echo of Andy Warhol's Campbell Soup Cans project.

124.     Further, each NFT will include one of a series of digital images created by illustrator Jude Buffum.

125.     After the initial sales of his digital art, Plaintiff Mann would receive a royalty for each sale of his NFT on a secondary market.

126.    Plaintiff Mann would promote his NFTs publicly on social media, and use part of the proceeds to grow and promote his Song A Day project.

127.    Plaintiff Mann has taken substantial steps to prepare for the release of the Mann Project, including writing the song, preparing the mixes, hiring Buffum (the visual artist) and commissioning those artworks, and preparing a publicity campaign.  Mann is ready and able to promptly release his project if and when the Court grants his request for a declaratory judgment. Absent court consideration of his rights to release this art without the SEC launching an investigation or initiating litigation, Mann is suffering hardship.

*ii.    The Frye Project*

128.    Plaintiff Frye intends to release a conceptual artwork called Cryptographic Tokens of Material Financial Benefit in the form of 10,320 Cryptographic Tokens of Material Financial Benefit NFTs minted on the Ethereum blockchain, each of which would represent ownership of one edition of the conceptual artwork Cryptographic Tokens of Material Financial Benefit (the "Frye Project").  This conceptual artwork would be sold by Securities Art LLC, a Louisiana limited liability company, for 0.01 ETH each and a total of 103.2 ETH.

129.    Securities Art LLC will sell each Cryptographic Tokens of Material Financial Benefit NFT subject to a smart contract that imposes a 5% resale royalty on each and every sale of that NFT, payable to Securities Art LLC.

130.    Plaintiff Frye has taken substantial steps to prepare for the release of the Frye Project, including designing the artwork, creating the LLC, and preparing a publicity campaign.

131.    Plaintiff Frye previously sought clarity from the SEC on former projects.  For example, on January 1, 2020, Frye submitted a request for a no-action letter to the SEC, proposing to sell 50 editions of a conceptual art project to the public and requesting confirmation from the

SEC that his proposal did not constitute the sale of an unregistered security.  On September 4, 2021, Frye sent another request for a no-action letter to the SEC, this time proposing to sell a similar work of conceptual art to the public in the form of 50 NFTs, each constituting 2% ownership in the conceptual artwork.  Frye received no response from the SEC.

132.    Frye sold those 50 NFTs, and subsequently made an open edition, each consisting of the following image:



133.    Frye sent a Freedom of Information Act request to the SEC, seeking access to records related to his January 2020 no-action letter.  He was denied access to those records on March 10, 2021.

134.    Another, unrelated individual sent a Freedom of Information Act request to the SEC for copies of all internal and external communications pertaining to the SEC's consideration of Frye's January 2020 no-action letter.  On April 19, 2022, the SEC granted limited access to heavily-redacted emails.  It was clear from those emails that the SEC Staff, who received a good faith request for an interpretation of the securities laws, shirked their duty to take Frye's no-action letter seriously.

135.    By refusing to respond to Frye's no-action letter, the SEC unilaterally deprived Frye of final agency action specific to his project, which in turn deprived Frye of both clarification of the laws and an immediate path to litigation (under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.), necessitating this action for a declaratory judgment. *See Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 637 (5th Cir. 2023) (finding that no-action letters, and withdrawals thereof, constitute final agency actions).

136.    Frye is ready and able to promptly release his current project if and when the Court grants his request for a declaratory judgment.  Absent court consideration of his rights to release his art without the SEC launching an investigation or initiating litigation, Frye is suffering hardship.

   *iii.    Plaintiffs' prospective projects do not involve investment contracts*

137.    Both Plaintiffs are creators who intend to sell digital assets in the form of NFTs to purchasers.  These sales do not constitute investment contracts.

138.    Purchasers or recipients of Plaintiffs' NFTs do not agree to the terms of any contract or arrangement.

139.    While Plaintiffs publicly discuss their intentions to continue creating and marketing their art, Plaintiffs do not have any ongoing commitment or obligation to undertake any specific action or to manage any common venture for the purchaser's benefit.

140.    And, while purchasers may hope the NFTs increase in value over time, and they may even hope that Mann and Frye grow in fame and renown from their individual efforts, which might raise the value of previous artworks Mann and Frye have sold, such purchasers have no reasonable expectation of profit based on Plaintiffs' managerial or entrepreneurial efforts.

141.    In that sense, Plaintiffs' NFTs are akin to traditional art pieces, or other collectibles such as baseball cards or sneakers.

142.    Yet, one Commissioner has noted that "the Commission's approach to this analysis for cryptocurrencies and digital assets has been that any item sold whose value is based on the efforts of others is a security. . . . This broad reading of Howey would appear to scope in many common transactions in the non-digital world, including pre-purchase commitments, collectibles, art, and land."[40]

143.    The Commission's approach towards NFTs has the potential to bleed into the traditional art and collectibles markets in an unprecedented and boundless manner.

144.    As already discussed, the SEC's orders in *Impact Theory* and *Stoner Cats* clearly establish the SEC's stance that creators of NFTs engage in the offer and sale of investment contract securities when they set out to sell their art—at least when accompanied by royalties and marketing statement discussing their current and future artistic endeavors, their subjective hopes for the value of their projects, and/or their use of profits from the NFT sales to financially support themselves and their artistic endeavors.

145.    Therefore, Plaintiffs face a credible threat of enforcement based on their creation and marketing of NFTs in light of *Impact Theory* and *Stoner Cats*, as well as the SEC's overall approach to digital assets, which would be economically devastating to Plaintiffs' artistic endeavors.

---

[40]    SEC Comm'r Mark T. Uyeda, *Remarks to the Council of Institutional Investors - Dangers of the Unbounded Administrative State* (Mar. 5, 2024), https://www.sec.gov/news/speech/uyeda-remarks-cii-030524.

146.    Even an SEC investigation, let alone litigation, can be ruinously expensive.  While some artists have been fortunate and talented enough to attain financial security, many artists, especially younger artists working in digital media, are not independently wealthy.  Yet, with the SEC's recent adversary proceedings against creators of art, artists who might wish to create and disseminate their art are forced to grapple with the threat of bankrupting legal bills because of an SEC investigation.  Responding to such an investigation can cost tens or hundreds of thousands of dollars, out of reach for many artists.  As a result, the SEC has unleashed a chilling effect over NFT artists across the United States.

147.    The SEC has not listened to reason, not even the reasoned opinions of two-fifths of its own Commissioners.  The SEC has signaled to digital art creators that their NFT sales—when coupled with royalties and marketing statements discussing their artistic endeavors, their hopes for the value of these endeavors, and/or their use of profits to support themselves and their endeavors—are securities offerings.

148.    Accordingly, Mann and Frye require federal court intervention to be able to offer and sell their prospective art projects without facing an enormously expensive SEC investigation, or an administrative or court action that might require them to—as the *Stoner Cats* and *Impact Theory* settlements did—literally destroy their own digital art in order to satisfy the SEC's wrath.

## COUNT ONE – DECLARATORY JUDGMENT

149.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

150.    The Declaratory Judgment Act, 28 U.S.C. § 2201, allows a party faced with a "genuine threat of enforcement" to bring suit to seek a declaration to determine the legality of an

expected government enforcement action.  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007).

151.    Plaintiffs Mann and Frye face such a genuine threat here.  The SEC has initiated two enforcement actions against issuers of NFTs premised on the position that they offered and sold such NFTs as investment contracts, and thus securities, without registering with the SEC.  The SEC has also embarked on at least one publicly known investigation into an NFT project.[41]

152.    As detailed above, Plaintiff Mann plans to release a limited edition set of NFTs composed of unique remixes of his popular song entitled "This Song Is A Security."  Plaintiff Mann will not be registering the offer and sale of his NFTs with the SEC, nor would those sales qualify for any apparent exemptions under the securities laws.  Thus, if his NFTs were deemed to be securities, it would be unlawful for Mann to offer or sell them.

153.    Given the SEC's history of bringing enforcement actions against Impact Theory and SC2 for similar conduct (each of which constituted a final agency action), Plaintiff Mann faces a genuine threat that the SEC will bring an enforcement suit against him if he releases the Mann Project.

154.    Also as detailed above, Plaintiff Frye plans to release a conceptual artwork called Cryptographic Tokens of Material Financial Benefit in the form of Cryptographic Tokens of Material Financial Benefit NFTs minted on the Ethereum blockchain, each of which would represent ownership of one edition of the conceptual artwork Cryptographic Tokens of Material Financial Benefit.  Plaintiff Frye will not be registering the offer and sale of his NFTs with the

---

[41]        *See supra* note 31.

SEC, nor would those sales qualify for any apparent exemptions under the securities laws.  Thus, if his NFTs were deemed to be securities, it would be unlawful for Frye to offer or sell them.

155.    Given the SEC's history of bringing enforcement actions against Impact Theory and SC2 for similar conduct (each of which constituted a final agency action), Plaintiff Frye faces a genuine threat that the SEC will bring an enforcement suit against him if he releases the Frye Project.

156.    Plaintiffs' offer and sales of NFTs do not form investment contracts under the *Howey* test.

157.    Plaintiffs will use the profits from the NFT sales to financially support themselves and other artistic endeavors, which may have the effect of bolstering their reputations and their art's acclaim.  However, using profits from the NFT sales in this way does not create a "common enterprise."

158.    Purchasers who buy Plaintiff's NFTs may *hope* that the value of the NFTs increase. Likewise, Plaintiffs' marketing will discuss their current and future artistic endeavors and their subjective hopes for the value of their projects, and their overall business success, but such marketing does not form an ongoing commitment to increase the value, or any "reasonable expectation of profit."

159.    A declaratory judgment is thus proper to allow Plaintiffs Frye and Mann to determine whether they can move forward with releasing their NFT projects without registering with the SEC and without risking the penalties that the SEC sought in the *Impact Theory* and *Stoner Cats* settlements.  *Cf., e.g., Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 619 (N.D. Tex. 2021) (declaratory judgment action appropriate where EEOC had previously brought

enforcement action against a similarly situated entity), *aff'd in relevant part sub nom. Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023).

160.    This credible threat of enforcement also illustrates the Plaintiffs' standing to bring this action.

161.    Further, because this suit seeks only declaratory and injunctive relief against a federal agency and federal officers sued in their official capacities, defendants are not entitled to sovereign immunity.  *See* 5 U.S.C. § 702; *Cambranis v. Blinken*, 994 F.3d 457, 462 (5th Cir. 2021); *Alabama-Coushatta Tribe of Tex. v. U.S.*, 757 F.3d 484, 488 (5th Cir. 2014).

162.    Plaintiffs Mann and Frye accordingly seek declaratory and injunctive relief to prevent the SEC from subjecting Plaintiffs to unlawful enforcement actions.

## RELIEF REQUESTED

163.    For the foregoing reasons, Plaintiffs respectfully request that the Court:

a.  Declare that Plaintiff Mann would not violate Sections 5(a) or 5(c) of the Securities Act by executing the Mann Project.

b.  Declare that Plaintiff Frye would not violate Sections 5(a) or 5(c) of the Securities Act by executing the Frye Project.

c.  Enjoin the SEC from bringing an enforcement action against Plaintiffs Mann and Frye premised on their failure to register with the SEC in relation to their release of the Mann and Frye Projects.

d.  Award any attorneys' fees, costs, and expenses to which Plaintiffs may be entitled by law; and

e.  Award any further relief the Court deems just and fair.

42

Dated:  July 29, 2024

/s/ David L. Patron
David L. Patron (La. Bar #22566)
Lindsay Calhoun (La. Bar # 35070)
Keiran S. McCluskie (La. Bar #40874)
PHELPS DUNBAR LLP
365 Canal Street, Suite 2000
New Orleans, LA 70130
Telephone: (504) 584-9295
Email:  david.patron@phelps.com
        lindsay.calhoun@phelps.com
        keiran.mccluskie@phelps.com

Jason P. Gottlieb (NY Bar # 4056008, *pro hac vice* forthcoming)
Rachel Fleder (NY Bar # 5796040, *pro hac vice* forthcoming)
Vani Upadhyaya (NY Bar # 5754569, *pro hac vice* forthcoming)
MORRISON COHEN LLP
909 Third Avenue
New York, New York 10022
Telephone: (212) 735-8600
Email: jgottlieb@morrisoncohen.com
        rfleder@morrisoncohen.com
        vupadhyaya@morrisoncohen.com

*Counsel for Plaintiffs Jonathan Mann and Brian L. Frye*