UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MANN, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>SECURITIES AND EXCHANGE COMMISSION, et al.,<br><br>        Defendants. | Civil Action No. 2:24-cv-01881-GGG-KWR<br><br>Section: T<br><br>Judge Greg G. Guidry<br><br>Mag. Judge Karen Wells Roby |

## BRIEF OF AMICUS PARADIGM OPERATIONS LP

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

Alexander C. Drylewski*
alexander.drylewski@skadden.com
One Manhattan West
New York, New York 10001
Tel: (212) 735-3000

Zachary M. Faigen*
zack.faigen@skadden.com
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Tel: (213) 687-5000

TAYLOR, PORTER, BROOKS &
PHILLIPS, LLP

Michael S. Walsh
michael.walsh@taylorporter.com
450 Laurel Street, 8th Floor (70801)
P.O. Box 2471
Baton Rouge, LA 70821-2471
Tel: +1 (225) 387-3221

*Pro Hac Vice Pending

# **TABLE OF CONTENTS**

STATEMENT OF INTEREST..................................................................................................1

SUMMARY OF POSITION ....................................................................................................2

ARGUMENT.............................................................................................................................4

I.  Overview of NFTs..................................................................................................4

II. NFTs Are Like Artwork, Collectibles and Other Consumer Goods, Not Securities ..........5

    A.  NFTs are bought and sold in the same way as artwork and collectibles.................5

    B.  Like art and collectibles, NFT prices vary and reflect consumer preferences........................................................................................................9

CONCLUSION.......................................................................................................................14

...

# TABLE OF AUTHORITIES

**CASES**

*Contract Buyers League v. F & F Investment*,
　　300 F. Supp. 210 (N.D. Ill. 1969) ............................................................................. 11, 14

*Hirk v. Agri-Research Council, Inc.*,
　　561 F.2d 96 (7th Cir. 1977) ............................................................................................ 10

*Lake v. Neal*,
　　585 F.3d 1059 (7th Cir. 2009) ......................................................................................... 3

*Mann v. SEC*,
　　No. 2:24-cv-01881-GGG-KWR (E. D. La., 2024) ........................................................ 1, 3

*Milnarik v. M-S Commodities, Inc.*,
　　457 F.2d 274 (7th Cir. 1972) .......................................................................................... 10

*Revak v. SEC Realty Corp.*,
　　18 F.3d 81 (2d Cir. 1994) ............................................................................................ 9, 10

*SEC v. W.J. Howey Co.*,
　　328 U.S. 293 (1946) ......................................................................................................... 2

*Top of Iowa Cooperative v. Schewe*,
　　6 F. Supp. 2d 843 (N.D. Iowa 1998), *aff'd*, 324 F.3d 627 (8th Cir. 2003) ....................... 10

*United Housing Foundation, Inc. v. Forman*,
　　421 U.S. 837 (1975) ..................................................................................................... 5, 9

*Wals v. Fox Hills Development Corp.*,
　　24 F.3d 1016 (7th Cir. 1994) ............................................................................................ 9

*Warfield v. Alaniz*,
　　569 F.3d 1015 (9th Cir. 2009) .......................................................................................... 5

**STATEMENT OF INTEREST**

Paradigm is a research-driven investment firm that invests in cutting-edge projects and protocols in the blockchain space. One area in which Paradigm focuses is non-fungible tokens, or NFTs. NFTs are unique digital records that convey ownership or other rights to digital or real-world assets. The assets can manifest themselves in a variety of forms, including artwork, collectibles, event passes, retail loyalty programs, real estate interests and more. New uses and manifestations emerge on a daily basis.

But the Securities and Exchange Commission ("SEC") has stifled the development of the NFT industry through enforcement actions targeting creators, alleging that their NFTs are "securities" and that selling them is a violation of the federal securities laws.[1] Recent reports indicate that the SEC has served a Wells Notice on NFT marketplace OpenSea, alleging that NFTs bought and sold on its platform are unregistered securities.[2] These actions have had an *in terrorem* effect on innovators who want to create digital art using NFT technology.

Indeed, Plaintiffs in this case are artists who have created works of art as NFTs that they plan to imminently release, yet they are afraid that doing so will subject them to SEC enforcement actions, which could entail monetary penalties and force Plaintiffs to "abandon their artistic endeavors."[3] Plaintiffs, along with other NFT artists and creators, have no meaningful

---

[1] *See SEC Charges Creator of Stoner Cats Web Series for Unregistered Offering of NFTs* (https://www.sec.gov/newsroom/press-releases/2023-178); *SEC Charges LA-Based Media and Entertainment Co. Impact Theory for Unregistered Offering of NFTs* (https://www.sec.gov/newsroom/press-releases/2023-163);

[2] *OpenSea receives Wells notice from SEC, regulator says NFTs are securities*, https://www.cnbc.com/2024/08/28/sec-issues-wells-notice-to-nft-marketplace-opensea.html (Aug. 28, 2024). Reports indicate that the SEC also recently issued a Wells Notice to another NFT project (@CyberKongz on X, (Dec. 16, 2024, 11:55 AM), https://x.com/CyberKongz/status/1868746903053127941).

[3] *Mann v. SEC,* No. 2:24-cv-01881-GGG-KWR  (E. D. La., 2024) Plaintiffs' Opposition to Motion to Dismiss, at 3.

guidance on when their creative endeavors will be considered unlawful because, thus far, the "SEC alone [has been deciding] which digital artists to attack."[4] This lack of guidance has had a stifling effect on the creation of art by Plaintiffs and others because without any clear direction, artists do not know if their work will be treated like a security or not. Paradigm, as an active investor in the NFT space, thus has a strong interest in the outcome of this lawsuit.

## SUMMARY OF POSITION

The Securities Act of 1933 prohibits the sale of unregistered securities unless an exception applies. "Securities" include "investment contracts." Under the Supreme Court's *Howey* test, an "investment contract" exists when a person (i) invests money, (ii) "in a common enterprise," and (iii) "is led to expect profits solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). Last year, a bare majority of SEC Commissioners took the position in two enforcement matters that the sales of certain NFTs met the definition of an "investment contract."[5] Two dissenting Commissioners disagreed, explaining the NFTs in one of the matters were the digital equivalent of Star Wars collectibles from the 1970s, which have never been considered subject to the federal securities laws.[6]

Much of the confusion appears to stem from a foundational misunderstanding of what NFTs are, how they operate, and how they are bought and sold on marketplaces. This misunderstanding is problematic when attempting to analyze whether NFTs qualify as securities. The principle underlying *Howey* is that "[f]orm" must be "disregarded for substance," and "emphasis [must be] placed on economic reality." *Howey*, 328 U.S. at 298. In other words, the

---

[4] *Id.* at 1.

[5] *See In the Matter of Impact Theory, LLC*, Release No. 11226; *In the Matter of Stoner Cats 2, LLC*, Release No. 11233.

[6] *See* H. M. Pierce & M. T. Uyeda, *Collecting Enforcement Actions: Statement on Stoner Cats 2, LLC,* SEC.GOV (Sept. 13, 2023).

2

Duck Test: "The Duck Test holds that if it walks like a duck, swims like a duck, and quacks like a duck, it's a duck." *Lake v. Neal*, 585 F.3d 1059, 1059 (7th Cir. 2009). So, when it comes to the "economic reality" of NFTs, the question here is: do they walk, swim and quack like a security? Or do they walk, swim and quack like all other artwork, collectibles, and consumer goods and thus fall outside of the federal statutory scheme Congress created?

The answer is clear: NFTs are modern-day, digital versions of artwork, collectibles, and other consumer goods that have long existed outside the reach of the federal securities laws. They are bought and sold like art, collectibles, and other consumer goods, including at traditional auction houses like Sotheby's and Christie's, and through online marketplaces where buyers and sellers interact. NFTs are also marketed in the same way, appealing to unique consumer tastes and excitement around rarity and exclusivity. The prices of NFTs are not dictated by "the efforts of the promoter or a third party," as with investment contracts; rather, they fluctuate based on style, trends, and qualities that reflect cultural moments and shifting paradigms, not profits and losses from an ongoing business enterprise.

The NFTs in this case are works of art created by artists.[7] The fact that they are in digital form should not preclude Plaintiffs from releasing them due to threat of SEC enforcement. NFTs can, and in this case do, embody the same economic realities as art and collectibles, and should not be regulated as securities. For these reasons, Paradigm respectfully requests that the Court accept this amicus brief, which helps explain the economic realities of NFTs as different from securities, and why it is imperative that this Court considers this case on the merits.

---

[7] *Mann v. SEC,* No. 2:24-cv-01881-GGG-KWR (E. D. La., 2024), Complaint, at 34, 35.

**ARGUMENT**

I. **Overview of NFTs**

NFTs are unique digital records that represent ownership of, or rights in, a specific asset, often a digital asset.[8] An NFT consists of computer code that includes, among other pieces of information, a unique identifier that identifies the asset with which it is associated, and—for digital assets—a link to where the asset itself is stored. This is analogous to having a certificate of ownership to a piece of art hanging on a wall that also includes a notation as to where that piece of art can be found.[9]

Transactions in NFTs are recorded on a blockchain—i.e., an immutable ledger that publicly reflects each NFT's creation and every transaction in which that NFT changes hands. This is a transformative innovation and solves a critical problem: how to determine true ownership of an original digital asset where it may be easily replicable and impossible to distinguish a copy from the original. Where the traditional art world has spawned an entire industry of professionals who record, track and verify provenance and ownership of a particular piece of art (and charge a hefty price for their services), an NFT's provenance and ownership is unalterably recorded on a public blockchain. Thus, while anyone can "right-click" and copy a digital piece of art, NFT technology provides immutable proof as to who owns the original.

NFTs can be created by anyone and bought and sold just like physical goods, where owners transfer unique, authentic ownership or license rights to the original work. Just like physical goods, owners can enjoy their NFTs as they see fit—including by displaying, exchanging, selling or gifting them.

---

[8] NFTs can also represent ownership of, or rights in, real-world assets, such as real estate, property rights, tickets, and more.

[9] As a technical matter, "NFT" refers to the blockchain-based digital certificate that corresponds to a digital asset. However, common parlance today is to use "NFT" to refer to both the certificate and the digital asset itself.

## II. **NFTs Are Like Artwork, Collectibles and Other Consumer Goods, Not Securities**

### A. **NFTs are bought and sold in the same way as artwork and collectibles**

As the Supreme Court has emphasized, the securities laws apply only where the purchaser is "'attracted solely by the prospects of a return' on his investment," not where the purchase "is motivated by a desire to use or consume the item purchased." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 858 (1975). In order to assess such motivations, courts "focus [the] inquiry on what the purchasers were offered or promised" and thus "led to expect." *Warfield v. Alaniz,* 569 F.3d 1015, 1021 (9th Cir. 2009).

Here, the ways in which NFTs generally are offered to consumers reveal strong parallels to art, collectibles and other consumer goods. Traditional collectibles and consumer goods are regularly bought and sold on online marketplaces like eBay, which let users shop for trading cards, sports memorabilia, coins, comic books, and other consumptive goods by allowing sellers to list their unique goods for a specific price, and buyers to bid on them or buy them outright.



NFTs are bought and sold in the same way. NFT marketplaces allow sellers to sell NFTs

directly to buyers, and, just like on eBay, let buyers either bid on the NFTs they want to acquire or buy them outright. Below are examples of a what typical pages look like on OpenSea and Magic Eden, two NFT marketplaces:



In fact, NFTs are bought and sold in some of the exact same marketplaces as physical art and collectibles. Christie's, one of the most well-renowned art auction houses, auctions NFTs in the same way it auctions traditional art. In 2021, Christie's auctioned "Everydays – The First

6

5000 Days," a JPG file by the artist known as Beeple (Mike Winkelmann), for $69.3 million, setting a record for the sale of digital art, and resulting in the third-highest auction price achieved for a living artist in any medium.[10] Christie's reported selling $150 million worth of NFTs in 2021,[11] and has continued to auction NFTs since. Below is a screenshot of a recent NFT listing on Christie's, and a screenshot of a physical piece listed on Christie's:



In 2023, Sotheby's, another world-famous auction house, launched a marketplace for

---

[10] "JPG File Sells for $69 Million, as 'NFT Mania' Gathers Pace," Scott Reyburn, New York Times, April 13, 2021.

[11] *See* C. Mozee, *Christie's sold $150 million of NFTs in 2021, with the auction house on track for $7.1 billion in sales for the year*, Dec. 21, 2021, https://markets.businessinsider.com/news/currencies/christies-nft-sales-total-beeple-auction-crypto-cryptopunks-2021-12#:~:text=Christie's%20sold%20$150%20million%20of%20NFTs%20in,also%20auctioned%20a%20set%20of%20CryptoPunk%20NFTs.

7

NFT artists to sell digital works. Sotheby's has hosted sales of solo NFT artists' collections and curated group shows, generating over $100 million in sales. Sotheby's Head of NFTs explained the decision as a way to "offer collectors more options for discovering and selling digital art."[12] Sotheby's even sells NFT art alongside other physical auction items. The Sotheby's upcoming auction page lists an auction of NFTs, the Gen Art / Bernar Venet Event, in between an upcoming auction for a wine collection and an auction of a Ducati:

  

Other similarities abound. "Drops," in which limited-edition apparel and accessories are released in limited quantities at a specific time, is a popular way to sell art, collectibles, and other consumer goods by creating exclusivity. Supreme, a popular apparel and skateboarding-focused accessory brand, is a leading example of how brands use "drops" to build anticipation and create demand through scarcity. Supreme has built a brand identity around limited edition "drops" to create a sense of exclusivity for its products. Collectors pay high prices to own Supreme

---

[12] *See* R. Whiddington, *Sotheby's Has Launched a Secondary Marketplace for NFTs, Allowing Artists to Sell Digital Works Directly to Collectors*, ARTNET, May 3, 2023, https://news.artnet.com/market/sothebys-secondary-marketplace-2294615.

8

products, and the limited edition merchandise often sells out quickly.[13]

NFT drops serve the same function, selling art in limited-edition collections, in the digital art and collectible space. Marketplaces and traditional auction houses promote and sell NFTs in much the same way they have historically marketed non-NFT forms of art. These drops build anticipation, attract collectors, and create excitement around the notion of scarcity and exclusivity.[14]

As these examples illustrate, NFTs are sold in the same way as traditional art and collectibles. And critically, NFTs—just like those in this case—are offered for personal consumption, rather than solely for profits from the efforts of others, which is a defining characteristic of investment contracts. *United Hous.*, 421 U.S. at 858.

### B. Like art and collectibles, NFT prices vary and reflect consumer preferences

The securities laws only apply when purchasers "obtain[] the same thing, namely an undivided share in the same pool of assets and profits." *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1019 (7th Cir. 1994). In contrast, if a class of assets are not the same or do not perform uniformly, they are not securities. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994).

Purchasers of NFTs do not receive a fungible item like a security; rather, they receive a unique, non-fungible piece of art or a collector's item. As a result, like with traditional art and collectibles, the prices of individual NFTs vary significantly—even within the same collection—based on factors such as rarity and subjective tastes. And because each owner can therefore "make profits or sustain losses independent of the fortunes of other purchasers," *Revak*, 18 F.3d

---

[13] *See* Supreme, HIGHSNOBIETY, https://www.highsnobiety.com/tag/supreme/#:~:text=IS%20 SUPREME %20A%20LUXURY%20BRAND,brand%20within%20the%20fashion%20industry.

[14] *See* K. Wadhwani, *A Comprehensive Guide to NFT Drops*, SOLULAB, https://www.solulab.com/a-detailed-understanding-of-nft-drops-meaning/.

9

at 88, and each owner "has a success or failure rate without regard to the others," *Hirk v. Agri-Rsch. Council, Inc.*, 561 F.2d 96, 101 (7th Cir. 1977), NFTs are not securities under any relevant test. *See Revak*, 8 F.3d at 88 (no security where condo purchasers each "owned individual units, and could make profits or sustain losses independent of the fortunes of other purchasers."); *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274, 277 (7th Cir. 1972) (no security where some asset purchasers "may show a profit, some a loss, but they are independent of each other").[15]

Take the Beanie Babies example. Beanie Babies on eBay are priced from a few cents up to a million dollars. Here is a screenshot showing the pricing variation within a single collection:



It may be that Ty Inc., the company that created Beanie Babies, could undertake efforts to increase awareness of, or excitement around, Beanie Babies generally. But we can see that the

---

[15] *See also Top of Iowa Cooperative. v. Schewe,* 6 F. Supp. 2d 843, 852 (N.D. Iowa 1998) (no common enterprise where "each producer owns specific grain rather than an undivided share of all of the grain" and thus "each producer's profit depends only on the performance of the producer's own grain"), *aff'd*, 324 F.3d 627 (8th Cir. 2003).

prices of individual Beanie Babies vary, which shows that perceived value is determined by the desirability of each unique collectible, rather than the group as an undivided whole. And although some consumers may buy Beanie Baby collectibles solely with the hopes of profiting from increased market prices in the future, that hope does not turn them into securities. *See Cont. Buyers League v. F & F Inv.,* 300 F. Supp. 210, 224 (N.D. Ill. 1969) ("To conclude that the natural desire of any purchaser that his purchase should appreciate in value makes a 'security' of what has been purchased, is obviously to so muddle the term as to make it meaningless.").

Similarly, for artists who work in more traditional mediums and sell their art at physical galleries and online, prices vary between different artists' collections and among different works within a collection. And although particular artists may see the prices of their works generally increase as they become more renowned, the varied prices between their individual pieces are driven by a variety of factors, including buyers' subjective tastes. Here is a screenshot from Singulart.com, selling physical prints by the French painter Mr. Strange at varying prices:



The same is true of NFTs. The pricing and value of NFTs reflect individual consumer preferences, fluctuate based on subjective tastes, and can vary significantly between NFT artists and within a single artist's collection. Two well-known NFT collections, CryptoPunks and Pudgy Penguins, demonstrate this variability. In one CryptoPunks collection, the NFTs exhibit a

11

range of visual aesthetics and a wide range of listed prices, from 29.93 ETH to over 1,000 ETH:



The Pudgy Penguins collection reflects a similarly wide range of visual aesthetics and price differentiation, with NFTs available for anywhere from 9 ETH to 100 ETH:



Rarity and perceived exclusivity are significant factors in determining the price of traditional art, as rare works often command higher prices based on uniqueness and distinct provenance. This is also true with NFTs. Studies show that prices of NFTs depend on the rarity

12

of the NFT's features[16] and higher NFT prices lead to increased trading volume due to a perception of exclusivity.[17] And because the provenance and history of ownership of an NFT is immutable and available for all to see, just like traditional art, this rich history also drives market value. For example, NFTs, with celebrity ownership in their history can have increased market value and NFTs that may have been stolen can have decreased value.[18]

The similarities between how traditional art and NFTs are priced do not stop there. "Herding behavior" refers to the tendency of art investors to gravitate towards well-established artists. While this behavior has been well-documented over the years in the traditional art world, economists have now observed this same phenomenon in the NFT market.[19]

To underscore this similarity further, manufacturers of traditional collectibles have expanded into the NFT space and price their NFTs the same way they sell and price their traditional collectibles. For example, Mattel manufactures collectors' items like Barbie and Hot Wheels. It recently launched a peer-to-peer marketplace for its virtual collectibles platform, allowing users to buy and sell Mattel NFTs.[20] Like its more traditional collectible offerings, Mattel's NFTs are priced based on the rarity of the collectible and consumer preferences. Here is a screenshot from Mattel's Virtual Marketplace of its "Boss Beauties x Barbie" Collection:

---

[16] W. Xiong, et al., "An Advanced Pricing Mechanism for Nonfungible Tokens (NFTs) Based on Rarity and Market Dynamics," IEEE Transactions on Computational Social Systems, Vol. 11, No. 6, pp. 7671-7684, Dec. 2024.

[17] G. Fridgen, et al., "Pricing dynamics and herding behavior of NFTs," European Financial Mgmt 1-41 (2024), https://onlinelibrary.wiley.com/doi/epdf/10.1111/eufm.12506.

[18] Eric Mack, "How Scammers Stole Seth Green's Bored Ape Yacht Club NFT and Converted It to Cash," FORBES (July 11, 2022), https://www.forbes.com/sites/ericmack/2022/07/11/how-scammers-stole-seth-greens-bored-ape-yacht-club-nft-and-converted-it-to-cash/; *see also* OpenSea, *Bored Ape Yacht Club #8398* (https://opensea.io/assets/ethereum/0xbc4ca0eda7647a8ab7c2061c2e118a18a936f13d/8398) (sale subsequent to Seth Green recovery following theft showing increase in price).

[19] *Id.*

[20] *See* J. Cirrone, "Mattel Marketplace Lets You Trade Barbie and Hot Wheels NFTs Peer-to-Peer," *Blockworks*, (April 21, 2023) https://blockworks.co/news/mattel-marketplace-barbie-hot-wheels-nfts.



Example after example shows that NFTs are valued and priced like art and collectibles. And like art and collectibles, some NFT consumers buy NFTs because they hope to profit from selling them at increased prices in the future. But that does not turn a consumptive product into a security subject to the federal securities laws. *Cont. Buyers League*, 300 F. Supp. at 224.

## CONCLUSION

Given the ongoing fear and confusion among creators who want to utilize NFT technology, as well as the critical importance of these issues to innovation in the U.S., Paradigm respectfully urges the Court to allow this matter to proceed to the merits, and ultimately, to conclude that Plaintiffs' NFTs are not securities.

DATED:  December 16, 2024          Respectfully submitted,

                TAYLOR, PORTER, BROOKS
                  & PHILLIPS, LLP

                */s/ Michael S. Walsh*
                Michael S. Walsh (Louisiana Bar #08500)
                michael.walsh@taylorporter.com
                450 Laurel Street, 8th Floor (70801)
                P.O. Box 2471
                Baton Rouge, LA 70821-2471
                Tel: +1 (225) 387-3221


                SKADDEN, ARPS, SLATE,
                 MEAGHER & FLOM LLP

                Alexander C. Drylewski (New York State Bar #4847844, *pro hac vice* pending)
                alexander.drylewski@skadden.com
                One Manhattan West
                New York, NY, 10001
                Tel: +1 (212) 735-3000

                Zachary M. Faigen (California Bar #294716, *pro hac vice* pending)
                zack.faigen@skadden.com
                2000 Avenue of the Stars, Suite 200N
                Los Angeles, California 90067
                Tel: +1 (213) 687-5000

                *Attorneys for Amicus Paradigm Operations LP*